A97A1136. SECURITY LIFE INSURANCE COMPANY v. CLARK et al.
(494 SE2d 388)

ANDREWS, Chief Judge.

Security Life Insurance Company (Security) appeals from the $14,476,694.18 judgment[1] entered against it on the jury's verdict in Mr. and Mrs. Clark's suit for interference with a property right, fraud, and violation of OCGA § 16-14-1 et seq., Georgia's Racketeer Influenced & Corrupt Organizations (RICO) statute.[2] Judgment was entered only on the RICO claim. The Clarks' claims arose from the February 1994 sale by Fipps, Security's agent, to Mr. Clark[3] of health insurance under the Insight Answer Plan, underwritten by Security, and the subsequent wrongful rescission of that insurance in November 1994.

The following facts were either stipulated to, were not contested, or come from evidence viewed in favor of the Clarks, opponents of Security's motion for directed verdict. Security is a Minnesota corporation which is wholly owned by Security American Financial Enterprises, Inc., a holding company, and Security is authorized to sell insurance in Georgia. Security, in the life and health insurance business over 25 years, is 80 percent owned by its employees, with 130 individuals, including its executives, owning the remaining 20 percent. Congress Life Insurance Company is wholly owned by Security and underwrites only in Alabama, due to the existence of another Alabama company named Security. Security does business in 43 states, including Georgia, and the District of Columbia.

Insurers Administrative Corporation (IAC), an Arizona company, acts as a third-party administrator of insurance policies for various insurers, including Security, with which it entered into an

---

[1] This sum consisted of $4,073,000 in compensatory damages (the $2,000,000 maximum benefit available for medical expenses to each Clark during the life of the policy, Mr. Clark's $10,000 life benefit, and $31,500 for each of the Clarks for mental suffering), trebled pursuant to OCGA § 16-14-6 (c) to $12,219,000, plus attorney fees and litigation expenses of $792,902.08, punitive damages of $1,500,000, and prejudgment interest of $374,792.10, reduced by pretrial settlements with other defendants of $410,000.

[2] The complaint, as originally filed, contained claims for breach of contract and wrongful interference with contract rights. These, however, were not pursued at trial. The wrongful interference with contract rights claim was replaced by the wrongful interference with property rights claim, upon which a verdict in the Clarks' favor was directed.

[3] Mrs. Clark was insured as a dependent.

Administrative Agreement in August 1990. Pursuant to that agreement, IAC used an underwriting manual produced by Lincoln National Corporation to process applications for insurance and administer the claims process for Security under the Insight Answer Plan. In addition, IAC was responsible for investigating suspected misstatements on applications for insurance and making recommendations to Security and Hassan, a California attorney used by Security as outside counsel for rescission matters, regarding rescinding insurance based upon alleged material misrepresentations on applications.

In 1992, IAC set up a trust in Mississippi, known as Multiple Unit Security Trust II (MUST II), for the sole purpose of issuing to MUST II Group Policy No. GH840, the Insight Answer Plan underwritten by Security. This policy was submitted to and approved by the Mississippi Insurance Commissioner, although the trust document and name of the administrator were not filed with the Commissioner as required and the cover letter accompanying the policy stated that it provided "employee" major medical benefits, which it did not. TrustMark Bank in Mississippi was the initial trustee, serving from June 15, 1992 until June 15, 1995. After TrustMark raised its charges, SentryCorp., Ltd. of New Jersey became successor trustee, although there was a gap of several months before the appointment was formalized.

The practice of setting up trusts for issuance of policies originated with multiple employer trusts used by small employers to gain the benefits of a larger group for insurance purposes. Multiple Unit Security Trust, set up in Mississippi by IAC in 1990, was such a multiple employer trust. MUST was not marketed in Georgia because, while Georgia allows multiple employer trusts,[4] it would not allow Security to tier rate such a trust.

MUST II was conceived in 1991 as a method by which to "provide major medical insurance for individuals and families, and [was] not employment related." Scott Wood of IAC approached Security with the concept, and the program was developed by IAC along with Insurance Compliance Services (ICS).

ICS was a New Jersey company composed of Ms. Alexander, who had previously worked with Union Fidelity Life Insurance Company as a claims adjuster, and Ms. Massey, a former employee of the Nevada Insurance Division who examined forms for compliance with Nevada requirements. Neither was an attorney. They gave compliance advice to insurance companies, including Security, based on

---

[4] See OCGA § 33-30-1 (a); Rules of Comptroller General, Insurance Dept., Chapter 120-2-50.

their review of state statutes and regulations. They did not examine court decisions in giving their advice. ICS, which had also advised Security in forming MUST, used the MUST trust agreement and the policy issued to MUST as a guideline in developing Group GH840. They also formed SentryCorp., Ltd. to become the successor trustee to TrustMark Bank for MUST II.

Bulletin 88-E-1 was issued by Georgia's Insurance Commissioner October 6, 1988, and stated that "[i]t is the position of the Georgia Department of Insurance that it has extraterritorial jurisdiction over all group health policies that are issued to trusts situated outside the State of Georgia covering insureds within the State of Georgia, unless said plans are subject to the exclusive jurisdiction of the federal government." The Bulletin apparently was premised on the Commissioner's Directive 88-EX-1, dated April 29, 1988, and titled "Insured Trusts Marketed As Employee Health Benefit Plans," which required insurers to file certain information with the Georgia Department of Insurance for "all group health plan business written on a trust. . . ." Representatives of Security had previously complied with Georgia's claimed extraterritorial jurisdiction for another insurance product offered in Georgia where the policy was issued to an out-of-state multiple employer trust.

It was the contention of ICS that, because certificates for Group GH840 were being sold to individuals and not to "employer groups" and because MUST II was a Mississippi "one life discretionary group" formed solely for the purpose of allowing otherwise unconnected individuals to purchase insurance at a group rate, which is allowed in Mississippi, Bulletin 88-EX-1 did not apply and Georgia did not have extraterritorial jurisdiction over the trust and policy.

Security intended to avoid compliance with Georgia laws and regulations which would have required it to provide Georgia's "mandated benefits" to certificate holders, since such benefits are generally "producer driven" and tend to raise rates charged insureds. Also, the program was designed in an effort not to be covered by small group laws regulating rates and benefits. Georgia defines small groups as groups of 50 or fewer. From 1992 to 1996, there were from 7,000 to 30,000 certificate holders, not counting dependents, insured under Insight Answer. Mississippi provides fewer mandated benefits, and the only requirement is that they be offered to the policyholder. ICS sent the Mississippi trustee the offer form and directed him to reject the offer of Mississippi mandated benefits, which he did.

John Fipps, a Conyers resident, was licensed to sell health and life insurance in Georgia in 1990 and was authorized to transact business for ten to fourteen insurance companies in Georgia. He was not, however, specifically appointed by Security to sell its products in Georgia until March 1994. Although the Request for Agent Certifi-

cate of Authority filed by Security with the Georgia Insurance Department stated that it had made a diligent inquiry regarding Fipps' qualifications, "including a character report by an agency not affiliated with this company," no such inquiry had been made. Security checked only to determine that Fipps was licensed in Georgia.

Fipps worked with Gregory Rosenthal,[5] who had been appointed by Security to represent it in Georgia in January 1993. Rosenthal and Fipps became aware of the Insight Answer product in January 1994 and, although Fipps never saw the Group GH840 policy, he was provided with marketing materials on it.

In early February 1994, Fipps contacted Clark's son, Ricky, after Ricky had responded to an ad in a magazine for an insurance product for Sepulveda, an insurance agency. Fipps got the referral, contacted Ricky Clark, and presented different proposals to him, including the Insight Answer Plan. On February 11, 1994, Fipps was introduced by Ricky to his father, Mr. Clark, at the elder Clark's store in Damascus, Georgia. Fipps asked Mr. Clark about his health insurance, and Clark informed him he had had coverage with National Health for years. Fipps told Clark about Insight Answer, including the fact that Clark's deductible would be $1,000 instead of National Health's $2,500 and Insight Answer's lifetime coverage was $2,000,000.

Clark decided to apply for the coverage and "Mr. Fipps read the application to me and I answered the questions for him." In the section of the application headed "Medical Questions," the form stated that "[f]ailure to divulge complete facts can be cause for rescission of your coverage." Clark answered affirmatively Questions 1 and 2 dealing with treatment within the last year by any health care provider for any medical condition and treatment within the last five years for any heart condition. Although Clark told Fipps he had had five heart bypasses within the past five years, Fipps told him only the last year's information was required, despite the specific five-year language, and "arteriosclerosis" was the only heart condition circled in response to the second question. Mr. and Mrs. Clark signed the application after it had been filled out by Fipps. Mr. Clark stated that he did not read over the application carefully before he signed it,[6] but Questions 1 and 2 were marked "yes." Below the health questions, the application stated that "I hereby apply for insurance to which I am now or may become entitled under the provisions of the Master Policy issued to the Multiple Unit Security Trust II by Security Life Insurance Company of America. I understand that my application is subject to approval by the Insurance company. I understand that my

---

[5] Rosenthal was also named as a defendant, but a verdict was directed in his favor.

[6] On cross-examination, Clark, asked about the application, stated that "I didn't read any of it."

coverage, if approved, . . . will be subject to the pre-existing condition provision specified in the Master Policy and that this provision has been fully explained to me."

Fipps also represented Southland Life Insurance Company and sold Mrs. Clark a $10,000 life insurance policy.[7] Mr. Clark was entitled to a $10,000 life benefit under the Insight Answer Plan. Fipps told the Clarks that he did not make much commission on health coverage and would make better commission on the Southland policy. Fipps received an advance of commissions on life products, amounting to 75 to 80 percent of the first year's premium, while only receiving 15 percent of the Insight Answer premium as it was paid monthly. The initial premium for the Insight Answer Plan was $289.16 per month, while the National Health Care premium was $445 per month. Mrs. Clark gave Fipps a check for the first month's premium.

When the application was received by IAC, the Clarks' affirmative answers to the two health questions had been changed to "no" and their signatures had been forged. A default judgment was entered against Fipps, and it was stipulated at trial that he had forged the signatures and submitted the altered application.

A certificate of insurance under Group GH840 was issued by IAC for Security, and the certificate was delivered to the Clarks by Fipps in March 1994. The certificate, as well as the cover letter accompanying it, identified the policyholder as "Multiple Unit Security Trust II" and stated that "[y]ou are eligible for insurance under the Policy as a member of the trust if you meet the eligibility requirements." Group Policy GH840 stated that persons eligible for insurance under it were "all members of the trust who meet the eligibility requirements in the Schedule of Insurance." The Schedule of Insurance identified as eligible "[a]ll individuals who are under the age of 65 and request to participate as a member of the Trust." The Trust Agreement defined as members "an eligible person to whom a group certificate is issued."

Although the front page of the application for insurance was attached to the certificate delivered to the Clarks, the back, containing the changed answers and forged signatures, was not. The Clarks then cancelled their National Health policy.

In June 1994, Mr. Clark went to see his doctor for a routine visit and submitted the $41 bill to IAC for payment. The bill showed a diagnosis of arteriosclerosis, which triggered an investigation by IAC based on the application submitted. Shortly after this inquiry began, as a result of the expiration of his six-month premium rate guarantee, Mr. Clark was notified by IAC that his premium was being

---

[7] This policy remains in effect.

increased from $299 per month to $419 per month "[i]n order to preserve the financial stability of the Multiple Unit Security Trust II." The trust's only asset was Group Policy GH840. Mr. Clark thereafter increased his stop loss to $4,000, lowering the premium and maintaining his Insight Answer coverage.

By letter of November 16, 1994, IAC notified Mr. Clark that his coverage was being rescinded effective March 1, 1994, due to the failure to provide accurate information concerning his medical history. Later, a refund check for his premiums minus paid claims was sent to him, which he did not cash because "I don't accept it."

As brought out by the Clarks during trial, Security and Philadephia Life Insurance Corporation entered into an Assumption Agreement on June 1, 1996, whereby Philadelphia, a company rated "A" by A. M. Best, assumed "certain group medical business," including the Insight Answer Plan, from Security, a "B+" rated company. In the agreement, the assumed business was described as "under a master policy issued to the Multiple Unit Security Trust II situated in Mississippi." Philadephia's Group Series 100 policy, issued to MUST II, has been filed with and approved by the Georgia Insurance Department since the docketing of this appeal. This policy includes the "Insight Answer 50/50 Indemnity" coverage, which is the plan opted for by Mr. Clark under his certificate of insurance under Security's Group GH840 policy, with the added Georgia-mandated benefits.

In the Pretrial Order, the Clarks' outline of their claim states they had been defrauded by Security, in "that Security . . . devised a scheme to defraud them and others and executed that scheme by unlawfully selling a life, accident and health insurance policy to them which had not been approved by the Georgia Insurance Commissioner's office." The Clarks' brief likewise describes a "wide-ranging fraudulent scheme which involved pawning off illegal, unapproved, pseudo 'group' insurance on an unsuspecting public, while deliberately avoiding regulatory compliance with insurance laws in the jurisdictions where it was sold" through the mechanism of an "air-breather group," i.e., MUST II.

1. Security's second enumeration, which we address first, is that the trial court erred in denying its motion for directed verdict at the close of the evidence.[8] The motion was that (a) there had been no

---

[8] In addition to the briefs of the litigants, we have been aided in our consideration of this case by amicus curiae briefs filed pursuant to Court of Appeals Rule 25, listed in the order filed, by the Reinsurance Association of America, the Georgia Insurance Commissioner, the Georgia Defense Lawyers Association, the Health Insurance Association of America, the American Council of Life Insurance, and the Georgia Trial Lawyers Association.

showing of a scheme to defraud insureds and that any errors in establishing the MUST II trust and issuing the policy to it were not the source of any injury to the Clarks; (b) there was no evidence of injury caused to the Clarks even if the Insight Answer Plan were part of an attempt to avoid regulatory oversight by the Georgia Department of Insurance; (c) there was no evidence of any crime indictable under OCGA § 16-14-3 (9) (A); and (d) the harm to the Clarks, the issuance to them and cancellation of their Insight Answer insurance, was the sole result of Fipps' independent forgery of their application and not the result of any alleged illegality of the Insight Answer Plan.

(a) Because the Pennsylvania Life group policy has now been approved by the Georgia Insurance Commissioner, this resolves adversely to the Clarks the issues of whether MUST II is a viable policyholder for certificates issued in Georgia, whether discretionary trusts are group or individual insurance under Georgia law, and whether individual underwriting may be done for group policies, as far as the Georgia Insurance Commissioner is concerned. See *Owens v. Ga. Underwriting Assn.*, 223 Ga. App. 29, 32 (3) (476 SE2d 810) (1996) (judicial notice may be taken of the Insurance Commissioner's filings).

(b) This leaves as the claimed "illegalities" in the Insight Answer Plan, as sold in Georgia, the failure of Security to file it with the Department and the failure of Fipps to have a certificate of authority issued by Security before selling the policy to the Clarks. For purposes of this opinion, we assume, without deciding, that such a filing was mandated.[9]

The Clarks rely upon *Olukoya v. American Assn. of Cab Cos.*, 219 Ga. App. 508 (465 SE2d 715) (1995) for the proposition that failure to file the policy with the Georgia Insurance Commissioner's office before marketing it in Georgia and to comply with other provisions of the insurance laws and regulations can serve as a predicate act of theft or mail and wire fraud under OCGA §§ 16-14-3 (9) (A) (ix), (xxiv) and 16-14-4. In *Olukoya*, Olukoya sued American Association of Cab Companies, Inc. (AACCI), claiming coverage under AACCI's

---

[9] The legislature amended Chapter 30 of Title 33, Group or Blanket Accident & Sickness Insurance, by enacting OCGA § 33-30-1.1, effective July 1, 1997, which added specific language that "[t]his chapter shall apply to policies of insurance, *certificates evidencing coverage under a policy of insurance. . . .*" (Emphasis supplied.) Since the legislature is presumed to enact legislation with "full knowledge of the existing condition of the law and with reference to it[,]" *Wigley v. Hambrick*, 193 Ga. App. 903, 905 (4) (389 SE2d 763) (1989), this enactment lends credence to Security's argument that, before this enactment, OCGA § 33-24-9 did not mandate filing with the Commissioner of group policies issued to out-of-state trusts. See *Boseman v. Connecticut Gen. Life Ins. Co.*, 301 U. S. 196 (57 SC 686, 81 LE2d 1036) (1936) (state where policy, not certificate, issued determines applicable law).

self-insurance plan based on breach of contract as well as RICO. Olukoya's appeal was from the denial of his motion for partial summary judgment which sought a determination that "operation of AACCI's self-insurance plan constituted an illegal scheme to sell insurance without a license."

In reversing the denial of this very specific motion, this Court concluded only that marketing of AACCI's self-insurance plan to third parties "constituted the illegal sale . . . of insurance in this state without a license" (a misdemeanor under OCGA § 33-23-4 (b) & (h)) and added "[i]n so holding, we note that the illegal sale of insurance *is not in and of itself a basis for a civil RICO action in this State,* but it may serve as such if it was conducted in violation of federal mail and wire fraud statutes or if it is proven to have been a fraud amounting to theft committed against plaintiff." (Emphasis supplied.) Id. at 510.

That failing to comply with the filing requirement is not sufficient to prove a RICO violation is also strongly supported by *Penn America Ins. Co. v. Miller*, 228 Ga. App. 659 (492 SE2d 571) (1997). There, Presiding Judge Pope, the author of *Olukoya,* determined that an insurer's failure to file a policy exclusion with the Insurance Commissioner pursuant to OCGA § 33-24-9 (a) does not void that provision, because that section "specifies no penalty for failure to file, much less the penalty exacted by the trial court." Id. at 660. *Penn America* also relies upon OCGA § 33-24-12 (a) which provides that "[a]ny insurance policy, rider, or endorsement . . . otherwise valid which contains any condition or provision not in compliance with the requirements of this title shall not be rendered invalid due to the noncomplying condition or provision but shall be construed and applied in accordance with such conditions and provisions as would have applied had the policy, rider, or endorsement been in full compliance with this title[,]" pointing out that "[t]his . . . statute shows the legislature did not intend a technical violation of OCGA § 33-24-9 (a) automatically to invalidate an unfiled exclusion." *Penn America,* supra at 660.

While *Penn America* deals only with failure to file an exclusion, the same rationale applies to failure to file the entire policy. We find persuasive in this regard *McCullough Transfer Co. v. Virginia Surety Co.*, 213 F2d 440 (6th Cir. 1954) and *Franklin v. St. Paul Fire &c. Ins. Co.*, 534 SW2d 661 (Tenn. App. 1975) which hold that, although failing to file the policy is a misdemeanor, such failure does not void the policy. See generally Annot., 55 ALR2d 481 (1957).

Since violation of this provision is a misdemeanor and will not result in the voiding of the policy, it cannot serve as the basis for a theft, fraud or mail fraud predicate act for RICO in this case. See *Moore v. Barge*, 210 Ga. App. 552, 557 (3) (436 SE2d 746) (1993).

This conclusion is buttressed by OCGA § 16-14-2 (b) in which "[t]he General Assembly declares that the intent of this chapter [RICO] is to impose sanctions against those who violate this chapter. . . . *It is not the intent of the General Assembly that isolated incidents of misdemeanor conduct . . . be prosecuted under this chapter.*" (Emphasis supplied.)

(c) Even assuming that the evidence presented below was sufficient to show a mail and wire fraud scheme by Security to avoid compliance with state laws and illegally sell insurance without properly appointing agents, there still has been no showing that the harm suffered by Mr. Clark,[10] the wrongful rescission of his Insight Answer insurance, flows from such a scheme so as to make him an "aggrieved person" or one who is "injured by reason of any violation of Code Section 16-4-4" within Georgia's civil RICO statute. OCGA § 16-14-6 (b) and (c).

"In order for an individual to recover under RICO, his injuries 'must "flow from the commission of the predicate acts." *Sedima(, S.P.R.L. v. Imrex Co.*, 473 U. S. 479 (105 SC 3275, 87 LE2d 346) (1985)). This means that a private plaintiff who wants to recover under civil RICO must show some injury flowing from one or more predicate acts. A plaintiff cannot allege merely that an act of racketeering occurred and that he lost money. He must show a causal connection between his injury and a predicate act. If no injury flowed from a particular act, no recovery lies for the commission of that act.' *Pelletier v. Zweifel*, 921 F2d 1465, 1497 (11th Cir. 1991). . . . 'This means that, when the alleged predicate act is [mail or wire fraud], *the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme.* (Cits.)' Id. at 1499-1500." (Emphasis supplied.) *Longino v. Bank of Ellijay*, 228 Ga. App. 37, 40-41 (2) (491 SE2d 81) (1997). This is a proximate cause requirement for recovery by a civil RICO plaintiff. *Pelletier*, supra at 1499 [12, 13].

Mr. Clark testified that he was never told about MUST II and did not know what it was; he did not know that the Insight Answer policy had not been filed with or approved by the Georgia Insurance Commissioner; and if he had been told these things, he would not have continued doing business with Fipps. He had no knowledge of any of the alleged misstatements made to various insurance regulatory agencies in Georgia and other states.

Further, Mr. Clark read only the front page of the certificate of insurance when Fipps delivered it to him to check the deductible

---

[10] Mrs. Clark did not testify at trial, and therefore, nothing has been proven regarding any influence on her of the alleged scheme.

amounts and coverage and did not discover anything about MUST II and the way the policy was being marketed without approval until his attorney explained it to him.

As in *Longino*, all of the alleged predicate acts, i.e., setting up MUST II, drafting the policy, establishing marketing materials, misleading various insurance commissioners regarding the policy, and avoiding compliance with insurance laws and regulations, occurred before the Clarks had ever met Fipps or heard of the policy.

Therefore, Security was entitled to a directed verdict on this ground also. See also *Mullen v. Nezhat*, 223 Ga. App. 278, 281 (3) (477 SE2d 417) (1996) (physical precedent).

(d) Another ground urged below by Security was that the harm suffered by the Clarks was attributable solely to the acts of Fipps and not participated in by Security. We also find this ground meritorious.

"Generally, an employer may be held responsible for the tortious act of an employee where the act was 'authorized by the employer prior to its commission, ratified (by the employer) after its commission, or committed within the scope of the employment. (Cit.)' [Cit.]" *Modern Woodmen of America v. Crumpton*, 226 Ga. App. 567, 568 (487 SE2d 47) (1997).

There is no evidence that Security was even aware of, much less approved of or ratified, the forgery committed by Fipps until months after the event when the June claim was submitted by Mr. Clark, leaving for consideration only the scope of employment issue.

As fully discussed in *Modern Woodmen*, the standard for holding the employer liable is " 'not whether the act was done during the existence of the employment, but whether it was done within the scope of the actual transaction of the master's business for accomplishing the ends of his employment. (Cits.) If a servant steps aside from his master's business to do an act entirely disconnected from it, and injury to another results from a doing of the act, the servant may be liable, but the master is not liable.' (Punctuation omitted.) *Wittig v. Spa Lady &c.*, 182 Ga. App. 689, 690 (356 SE2d 665) (1987)." Id. at 568-569.

Here, as brought out by the Clarks, Fipps was not formally authorized by Security to sell the Insight Answer Plan until after he took their application. Also, the only one who had something to gain from the falsification was Fipps. As he testified, he was using the Insight Answer product as an attractive product to get the customer's attention, and then attempting to sell them life insurance, from which he made a better commission. Of course, until the forgery was discovered, if at all, he collected some commission on the health business he sold.

Security did not benefit from the falsification because it did not have the opportunity to evaluate Mr. Clark's true medical condition

before accepting the risk of insuring him. Although Fipps forged the application, Security "cannot avoid its obligations under the contract of insurance by denying responsibility for fraudulent acts committed by its agent outside the scope of employment which altered the contract to the detriment of the insured. [*Stillson v. Prudential Ins. Co. &c.*, 202 Ga. 79, 83 (42 SE2d 121) (1947)]." *Modern Woodmen*, supra at 569. Therefore, Security has a contractual obligation it would not otherwise have assumed.

2. Security's first enumeration is that the trial court erred in directing a verdict in favor of the Clarks on their wrongful interference with property rights claim. We agree.

" 'It is well settled that misfeasance in the performance of a contractual duty may give rise to a tort action. But in such cases the injury to the plaintiff has been an independent injury over and above the mere disappointment of plaintiff's hope to receive the contracted-for benefit.' (Citations and punctuation omitted.) [Cit.] Mere breach of the contract's terms is insufficient to create a tort cause of action; the defendant must also breach an *independent* duty created by statute or common law. [Cit.]" *Construction Lender v. Sutter*, 228 Ga. App. 405, 409 (2) (491 SE2d 853) (1997).

*Globe Life &c. Ins. Co. v. Ogden*, 182 Ga. App. 803, 804 (1) (357 SE2d 276) (1987) determined that, as between insured and insurer, there had been no showing made of any such "special relationship . . . involving 'a public duty the breach of which will support an action in tort.' *Leonard* [*v. Firemen's Ins. Co.*, 100 Ga. App. 434, 435 (111 SE2d 773) (1959)]." Neither was any such showing made in the Clarks' case. *Tate v. Aetna Cas. &c. Co.*, 149 Ga. App. 123, 124 (253 SE2d 775) (1979); see *Bowdish v. Johns Creek Assoc.*, 200 Ga. App. 93, 94 (3) (406 SE2d 502) (1991).

The two cases relied upon by the Clarks in support of this claim[11] both deal with wrongful foreclosure where there is a statute providing the public duty which, although arising from contract, supports the tort. There is no such basis for the tort in the Clarks' situation, and their remedy was contractual. *Globe Life &c. Ins. Co.*, supra.

3. The fifth enumeration deals with the trial court's pretrial sanctions, including attorney fees, imposed on Security based on discovery disputes.

An order was entered on November 22, 1995, overruling Security's objections and compelling discovery responses. That order is not included in the enumeration of error. On March 19, 1996, the trial court entered an order finding that "Security's failure to comply with

---

[11] *Clark v. West*, 196 Ga. App. 456 (395 SE2d 884) (1990) and *Gilbert v. Cherry*, 136 Ga. App. 417, 418 (1) (221 SE2d 472) (1975).

plaintiffs' discovery requests and the Court's order is willful and deliberate, is without substantial justification in fact or law" and granting plaintiffs' motion for sanctions. The order "finds that the appropriate sanction here is to find Security in civil contempt for failing to comply with the Court's procedures and order and for misrepresenting the non-existence of relevant documents to the Court. The appropriate remedy, at least for the present, is an order requiring Security to compensate the plaintiffs for their expense and inconvenience caused by Security's misconduct." No amount was designated.

On May 21, 1996, a second order imposing sanctions was filed, striking certain defenses and denials of Security and, again, "award[ing plaintiffs] their reasonable attorney's fees and expenses in taking the deposition of [Security's in-house counsel] and in connection with their second motion for sanctions."

During trial, evidence of these discovery disputes and these orders were introduced and the trial court instructed the jury on OCGA § 9-15-14. A total of $792,902.08 in attorney fees and expenses was imposed, and the court held that the earlier orders were "subsumed in the amount awarded in this final judgment."

Therefore, the issues in the fifth enumeration are moot.

4. The remaining enumerations are rendered moot by the holdings in Divisions 1 and 2.

*Judgment reversed. Birdsong, P. J., and Ruffin, J., concur.*

DECIDED DECEMBER 2, 1997 —

*Sutherland, Asbill & Brennan, William D. Barwick, Teresa W. Roseborough, Rowan & Neis, Robert J. Neis*, for appellant.

*William S. Stone, Kevin R. Dean*, for appellees.

*Beckmann & Pinson, William H. Pinson, Jr., Goldner, Sommers, Scrudder & Bass, Henry E. Scrudder, Jr., Morris, Manning & Martin, Lewis E. Hassett*, amici curiae.